**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **LUCIAN A. CLEMMONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:19-cv-00065** |
| | ) | |
| **ADAM COTHRON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Lucian Clemmons filed this action under 42 U.S.C. § 1983 against Adam Cothron and Doug Foster, in their individual capacities as troopers for the Tennessee Highway Patrol ("THP"), and Richard Cobble, in his individual and official capacities as a deputy sheriff for the Putnam County Sheriff's Department. Before the Court are two Motions for Summary Judgment: one filed by Cobble (Doc. No. 55); and one filed by Cothron and Foster (the "Troopers") (Doc. No. 63). Plaintiff filed a Response to each Motion. (Doc. No. 79) (Response to Cobble); (Doc. No. 83) (Response to the Troopers)). Both Cobble (Doc. No. 81) and the Troopers (Doc. No. 85) filed a Reply. For the following reasons, Cobble's Motion will be granted, and the Troopers' Motion will be granted in part and denied in part.

I.      **Background**

A.      **Events Leading to Traffic Stop**

Around 8:00 p.m. on August 21, 2018, Troopers Cothron and Foster were parked in Cothron's patrol car on a paved median on the interstate in Putnam County, perpendicular to the road, with headlights on and white "take down" lights activated. (Doc. No. 84 ¶¶ 1–2). Cothron, in the driver's seat, and Foster, in the front passenger seat, saw a black Chevrolet Avalanche

approaching. (Id. ¶¶ 3–4). Plaintiff was driving this vehicle eastbound in the right lane with his cruise control set to 75 mph, and he tapped the break to cancel the cruise control when he passed the patrol car. (Id. ¶¶ 3–7). The Troopers claim that they saw Plaintiff drive across the white fog line[1] (id. ¶ 6), and Plaintiff denies doing so (Doc. No. 83-7 at 12).[2]

The Troopers pulled onto the interstate, travelling eastbound in the left lane. (Doc. No. 84 ¶ 8). There were no vehicles between the Troopers and Plaintiff. (Id. ¶ 9). The Troopers claim that they saw Plaintiff cross the fog line two more times (id. ¶¶ 10–11), and Plaintiff again denies doing so (Doc. No. 83-7 at 12). The Troopers pulled directly behind Plaintiff in the right lane, and Cothron determined that Plaintiff was travelling between 59 and 61 mph in a 70 mph zone. (Doc. No. 84 ¶¶ 12–13). Plaintiff testified that he was approaching the exit he took to get home. (Doc. No. 83-7 at 6–7).

### B.  Traffic Stop and Initial Questioning

At 8:03 p.m., Cothron turned on his blue lights and Plaintiff pulled over on the exit off-ramp. (Doc. No. 84 ¶ 14). At 8:04 p.m., the Troopers approached Plaintiff's vehicle on foot—Cothron on the passenger side and Foster on the driver side. (Id. ¶ 15). Cothron asked for Plaintiff's license and registration. (Id. ¶ 16). Plaintiff provided his license, and while he looked for his registration, Cothron explained that Plaintiff was being stopped for "failure to maintain his lane of travel." (Id. ¶ 17).

---

[1] Tennessee courts have "used the term 'fog line' to describe the line painted on a roadway to define its edge." State v. Smith, 484 S.W.3d 393, 398 n.2 (Tenn. 2016) (citing Helton v. Knox Cnty., Tenn., 922 S.W.2d 877, 880 (Tenn. 1996)).

[2] This citation is to an excerpt from Plaintiff's deposition. For citations to deposition excerpts filed by the parties, the Court will cite to each excerpt's CM-ECF docket entry and pagination, rather than the transcript's internal pagination, because the parties submitted excerpts of Plaintiff's deposition with internal transcript pagination that does not match. (Compare Doc. No. 55-6 at 2 (transcript internal page 17), with Doc. No. 83-7 at 5 (transcript internal page 17)).

2

Over the next three minutes or so, the Troopers asked Plaintiff a series of questions. Cothron asked Plaintiff, "Where you been? You been working?" (Troopers' Exhibit Manually Filed Oct. 26, 2020 ("Video 1") at 20:04:50).[3] Plaintiff said that he had been working at Purdue Farms in Monterey, Tennessee. (Video 1 at 20:04:53). Foster then asked Plaintiff why he was travelling toward Monterey, rather than away, and Plaintiff said that he visited family after work and was on his way home. (Doc. No. 84 ¶¶ 19–20).

Cothron mentioned Plaintiff's tattoo and asked him about a gang affiliation. Cothron claims that he noticed Plaintiff had a tattoo on his right arm that was "known to [Cothron] to be related with the Gangster Disciples." (Doc. No. 73-1 ¶ 13). Plaintiff states that "[i]t is questionable as to whether . . . Cothron could have clearly seen the tattoo" (Doc. No. 84 ¶ 21), and Plaintiff testified that the tattoo was not gang related. (Doc. No. 83-7 at 10–11). Regardless, the video reflects that Cothron said to Plaintiff, "I noticed your tattoo. Are you part of Gangster Disciples?", and Plaintiff said, "No." (Video 1 at 20:05:16). Cothron asked, "Were you ever? When you were younger?", and Plaintiff said, "A long time ago." (Id. at 20:05:19). Cothron asked, "So you're not affiliated with them anymore?", and Plaintiff said, "No." (Id. at 20:05:23).

Cothron asked Plaintiff if he had been ever been arrested, and Plaintiff said that he had been previously arrested for a domestic offense. (Doc. No. 84 ¶ 23). Cothron asked Plaintiff if he had any warrants, and if he was on probation or parole, and Plaintiff said no. (Id. ¶ 24). Cothron asked Plaintiff if there were any illegal drugs or weapons in the vehicle, and if he would consent to a search of the vehicle, and Plaintiff said no. (Id. ¶ 26).

---

[3] This exhibit shows the first part of Trooper Cothron's dash cam footage from the traffic stop. (See Doc. Nos. 68, 69). Deputy Sheriff Cobble manually filed a short excerpt from this video (see Doc. Nos. 61, 62), but the Court will not cite to it directly because it is incorporated within the longer video. Plaintiff also manually filed dash cam footage that picks up where the longer video ends (see Doc. Nos. 78, 82), which the Court will refer to as "Video 2" below. Citations to a video's timestamp reflect the approximate start time of an event.

During the questioning about drugs or weapons, Cothron noticed Plaintiff become extremely nervous, with his breathing heavy and labored. (Id. ¶¶ 27–28). Foster told Plaintiff that he could "see [Plaintiff's] heart beating in his chest," and Plaintiff said that he was nervous. (Video 1 at 20:06:47). In a quick exchange, Cothron asked Plaintiff in a raised voice, "Why you so nervous?", Plaintiff said, "Huh?", and Cothron repeated, "Why you so nervous?" (Id. at 20:06:52). Plaintiff said, "Just nervous, period." (Id. at 20:06:54). Cothron claims in his affidavit that, during this initial round of questioning, Plaintiff displayed a "sign of deception" through "stiff and rigid body posture" and by "only briefly look[ing] at [Cothron] while [Cothron] was talking to [Plaintiff]." (Doc. No. 73-1 ¶ 18). Plaintiff denies this claim by pointing out that neither Cothron nor Foster mentioned this behavior during their depositions. (Doc. No. 84 ¶ 30).

### C.    Warrant Check and Drug Dog Request

At 8:07:16 p.m., the Troopers ended their initial questioning of Plaintiff and returned to the patrol car. (Doc. No. 84 ¶ 31). At 8:07:54 p.m., Cothron initiated a call to THP dispatch during which he requested a warrant check and drug dog. (Video 1 at 20:07:54). While Cothron was waiting for dispatch to respond, he checked Plaintiff's driver's license and called Wilson County, the location of Plaintiff's domestic offense charge, to see if Plaintiff had any outstanding warrants there. (Doc. No. 84 ¶ 33). Meanwhile, Foster called the Blue Lighting Operations Center ("BLOC")[4] to ask if it had a record of any warrants for Plaintiff. (Id. ¶ 34).

At 8:12:13 p.m., the driver's license check showed that Plaintiff's license was valid. (Id. ¶ 35). At 8:14:22 p.m., dispatch advised that the National Crime Information Center ("NCIC") did not identify any outstanding warrants for Plaintiff. (Id.). And at 8:17:06 p.m., Putnam County

---

[4] The Court takes judicial notice that BLOC is a "service that conducts a more complete records check than [a] police dispatcher" may be "able to provide." See United States v. Campbell, 511 F. App'x 424, 426 (6th Cir. 2013).

4

Deputy Sheriff Cobble arrived at the scene with drug dog Bolt. (Id. ¶ 37). Throughout this time, Foster had not heard back from BLOC (id. ¶ 36), and Plaintiff points out that the Troopers do not state when, if ever, the BLOC results were received (id. ¶ 40).

### D.     Dog Sniff, Search, and Criminal History Investigation

In January 2015, September 2015, October 2016, and October 2017, Deputy Sheriff Cobble and Bolt were certified for detecting marijuana, methamphetamine, cocaine, and heroin. (Doc. No. 55-1 at 11, 14, 18, 20). This certification was valid at the time of the traffic stop. (Doc. No. 84 ¶ 43). Cobble claims that Bolt "has never had a false alert" (Doc. No. 80 ¶ 2), and Plaintiff denies this claim by pointing to Trooper Cothron's deposition testimony agreeing that drug dogs are not "100 percent perfect." (See Doc. No. 79-6 at 2).

At 8:17:55, Plaintiff complied with Cothron's instruction to exit the vehicle. (Video 1 at 20:07:55). At 8:19:11, Cobble led Bolt down the driver side of Plaintiff's vehicle. (Id. at 20:19:11). Cobble told the Troopers that Bolt gave a positive alert at the driver side door. (Doc. No. 84 ¶¶ 38–39). Based on this alert, the Troopers began searching the vehicle, and Cothron found a loaded handgun with two magazines in the center console. (Id. ¶ 44). The Troopers then placed Plaintiff in handcuffs. (Video 1 at 20:21:21).

At 8:22 p.m., Cothron called THP dispatch to request Plaintiff's criminal history in order to determine whether Plaintiff could lawfully possess the gun. (Doc. No. 84 ¶ 45). While waiting for Plaintiff's criminal history report, the Troopers continued searching the vehicle, and they did not find any illegal drugs. (Id. ¶¶ 46–47).

At 8:32 p.m., Cothron received Plaintiff's criminal history report from dispatch. (Id. ¶ 48). Plaintiff admits that he was a convicted felon at the time of the traffic stop (Doc. No. 80 ¶ 8), but the video reflects that the Troopers had some initial uncertainty about Plaintiff's criminal history

5

status. Cothron reviewed the report and found that Plaintiff had been arrested on various charges, but Cothron was unsure whether Plaintiff had been convicted on any of those charges, saying at one point, "So is he a felon in possession of a firearm?" (Video 1 at 20:36:04). Cothron claims that the report led him to believe that Plaintiff was a convicted felon because it showed that Plaintiff had been issued an identification number in the Tennessee Offender Management Information System ("TOMIS") and therefore had previously been in Tennessee Department of Correction custody. (Doc. No. 73-1 ¶ 33). Plaintiff denies this claim, noting that Cothron did not mention any TOMIS number at the time. (Doc. No. 84 ¶ 50).

At 8:38:23 p.m., Cothron asked Plaintiff if he had been convicted of a marijuana charge listed on the criminal history report that Cothron believed to be a felony. (Video 1 at 20:37:44). Plaintiff said, "Yes I was." (Id. at 20:38:23). Cothron asked Plaintiff "how much time" he did for that offense, and Plaintiff said, "None. Pretrial diversion." (Id. at 20:38:25). Cothron again asked, "But you was convicted of it," and Plaintiff said, "Yes." (Id. at 20:38:30). Cothron then asked Plaintiff if he had been convicted of two domestic offenses listed on the criminal history report, and Plaintiff said no. (Id. at 20:38:38). The Troopers went back to the patrol car, and Cothron returned at 8:53:06 to ask Plaintiff about a charge for possession of a weapon by a convicted felon. (Id. at 20:53:06). Cothron asked if Plaintiff was convicted of that charge, and Plaintiff said, "I believe so." (Id. at 20:53:18). Cothron asked Plaintiff if he "served time" for that conviction, and Plaintiff said that he served two years of probation. (Id. at 20:53:25). Plaintiff confirmed that the felony underlying that charge was the previously discussed marijuana charge. (Id. at 20:54:34).

At 9:01 p.m., Cothron placed Plaintiff in the patrol car. (Plaintiff's Exhibit Manually Filed Dec. 1, 2020 ("Video 2") at 21:01:20). While the Troopers completed paperwork and inventoried Plaintiff's vehicle, beginning at 9:07, Deputy Sheriff Cobble walked down the passenger side of

6

the vehicle, opened the passenger door, and searched. (Video 2 at 21:07:25). In a Canine Report subsequently completed by Cobble, he states that he found "a very small amount of green plant material, consistent with marijuana, under the right front passenger seat." (Doc. No. 79-2 at 2). Cobble testified that a test would be needed to determine if something is marijuana or hemp, and that the material found in Plaintiff's vehicle was not tested. (Doc. No. 79-7 at 5–6). Cobble also testified that it was a "non-seizable amount" (id. at 7), and he stated in his declaration the it "was certainly not an amount sufficient to charge" Plaintiff. (Doc. No. 55-4 at 3).

### E. Arrest and State Court Proceedings

Trooper Cothron arrested Plaintiff for possession of a firearm by a convicted felon, in violation of Tenn. Code Ann. § 39-17-1307(b)(1)(B), and he cited Plaintiff for failure to maintain lane, in violation of Tenn. Code Ann. § 55-8-123. (Doc. No. 84 ¶ 52). Deputy Sheriff Cobble, meanwhile, did not touch or physically arrest Plaintiff. (Doc. No. 80 ¶¶ 3–4). The Putnam County Grand Jury returned a True Bill of indictment on the felon-in-possession charge. (Id. ¶¶ 53–54). Cothron testified before the Grand Jury and did not make any false or misleading statements. (Id. ¶¶ 53, 55).

Plaintiff filed a Motion to Suppress in his state criminal case. (Doc. No. 55-3 at 1). In May 2019, the Putnam County Criminal Court entered an "Order of Nolle Prosequi," stating as follows:

> This matter came to be heard before the Honorable David Patterson, Criminal Court Judge of Putnam County, Tennessee, at which time the State moved that a nolle prosequi be entered in the above styled cause because the State concedes that the defendant's motion to suppress is well taken based on an illegal traffic stop of the defendant's vehicle.
>
> **THEREFORE, IT IS HEREBY ORDERED**, on the motion of the State, that a Nolle Prosequi be entered, but the defendant shall forfeit the confiscated property to the THP . . . since he is a convicted felon and is forbidden to have firearms.

(Id.). The "confiscated property" referred to in this order is the handgun and magazines Cothron found during the search of Plaintiff's vehicle. (Id. at 3).

**F.      This Lawsuit**

In August 2019, Plaintiff filed this lawsuit asserting nine claims. In Counts I and II, respectively, Plaintiff asserts that Defendants violated his Fourth Amendment rights to be free from unreasonable search and seizure (Doc. No. 1 ¶¶ 67–84), and false arrest and false imprisonment (id. ¶¶ 85–89). In Count III, Plaintiff asserts that Defendants failed to intervene in the violation of his constitutional rights. (Id. ¶¶ 90–95). In Count IV, Plaintiff asserts that Defendants conspired to deprive him of his Fourth Amendment rights under Section 1983. (Id. ¶¶ 96–105). And in Counts V, VI, VII, VIII, and IX, respectively, Plaintiff asserts state law claims of false arrest, false imprisonment, civil conspiracy, vicarious county liability, and intentional infliction of emotional distress. (Id. ¶¶ 106–21). Cobble and the Troopers move for summary judgment on all claims.

**II.      Legal Standard**

The Court will grant summary judgment to moving parties that show "there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court "must ultimately decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Burgess v. Fischer, 735 F.3d 462, 471 (6th Cir. 2013) (quoting Anderson, 477 U.S. at 251–52). In doing so, the Court "draw[s] all reasonable inferences in the light most favorable to the non-moving party."

8

Davis v. Gallagher, 951 F.3d 743, 747 (6th Cir. 2020) (citing Anderson, 477 U.S. at 251–52). "But where, as here, there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" Green v. Throckmorton, 681 F.3d 853, 859 (6th Cir. 2012) (quoting Scott v. Harris, 550 U.S. 372, 378–81 (2007)).

## III.    Analysis

### A.    Forfeited Claims

Cobble and the Troopers move for summary judgment on all claims, and Plaintiff forfeits several claims in response. See Watkins v. Healy, --- F.3d ----, 2021 WL 287755, at *12 n.25 (6th Cir. Jan. 28, 2021) (quoting Berkshire v. Beauvais, 928 F.3d 520, 530 (6th Cir. 2019)) ("Waiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right.").

First, the Troopers request summary judgment on Counts IV and VII, Plaintiff's conspiracy claims under federal and state law. (Doc. No. 73 at 19–21). Plaintiff does not respond to this argument, and he admits that Defendants had no agreement or plan to violate his constitutional rights. (Doc. No. 84 ¶¶ 57–59). The Troopers also move for summary judgment on Count IX, intentional infliction of emotional distress (Doc. No. 73 at 21–23), and Plaintiff again does not respond. Accordingly, Counts IV, VII, and IX are forfeited.

Next, Deputy Sheriff Cobble moves for summary judgment on Plaintiff's official-capacity claims. (Doc. No. 56 at 17). Plaintiff fails to respond to this argument, and he admits that Cobble "is not a 'policymaker' for Putnam County." (Doc. No. 80 ¶ 7). Plaintiff's official-capacity claims against Cobble are thus forfeited as well.

Finally, in Count VIII, Plaintiff asserts that Putnam County is directly liable under Tenn. Code. Ann. § 8-8-302 due to the actions of Deputy Sheriff Cobble. (Doc. No. 1 ¶¶ 117–18). This

statute allows a person who suffers harm from "any act or failure to act" by a county sheriff's deputy "acting by virtue of or under color of the office" to "bring suit against the county in which the sheriff serves." Tenn. Code. Ann. § 8-8-302. In Cobble's summary judgment motion, he correctly notes that "Putnam County is not a named Defendant in this case."[5] (Doc. No. 55 at 2). Perhaps for this reason, Cobble does not specifically reference Count VIII in the memorandum accompanying his summary judgment motion. (See Doc. No. 56). Because Cobble has moved for summary judgment on all claims against him, however, Plaintiff must "'come forward with every legal theory' on which he relie[s]." Dibrell v. City of Knoxville, Tenn., 984 F.3d 1156, 1160 (6th Cir. 2021) (quoting Nat'l Credit Union Admin. v. Mich. Nat'l Bank of Detroit, 771 F.2d 154, 161 (6th Cir. 1985)). And Plaintiff does not articulate a theory of liability for Count VIII against Cobble (or, for that matter, the Troopers). Count VIII is therefore forfeited.

In sum, three categories of claims remain against Defendants in their individual capacities only: federal unreasonable search and seizure claims (Count I); federal and state claims for false arrest and false imprisonment (Counts II, V, VI); and federal failure-to-intervene claims (Count III). The Court will address two procedural arguments—one raised by Cobble, and one raised by Plaintiff—before turning to the substance of the remaining claims.

### B. **Heck** Doctrine

As a threshold matter, Cobble argues that this entire action must be dismissed based on Heck v. Humphrey, 512 U.S. 477 (1995). (Doc. No. 55 at 2; Doc. No. 56 at 20–23). Under the

---

[5] At least two federal district courts in Tennessee have recognized that the failure to name a county as a defendant precludes recovery a Section 302 claim. See Trobaugh v. Melton, No. 2:15-CV-00005, 2016 WL 3031610, at *7 (M.D. Tenn. May 27, 2016) ("This statute provides for recovery from a county itself, so [plaintiff] would only recover if he served Overton and Smith Counties in this action."); Colson v. City of Alcoa, Tenn., No. 3:16-CV-377, 2017 WL 4019596, at *9 (E.D. Tenn. Sept. 11, 2017) (citation omitted) ("[I]n suing the officers themselves rather than a county, [plaintiff] ventures beyond the recourse available to a plaintiff under the statute.").

*Heck* doctrine, a plaintiff cannot bring a "[Section] 1983 claim if its success 'would necessarily imply the invalidity of his conviction or sentence.'" *Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019) (quoting *Heck*, 512 U.S. at 487). Although Cobble recognizes that Plaintiff was not convicted or sentenced as a result of the traffic stop, he argues that *Heck* should apply here because success in this case would imply the invalidity of forfeiture language[6] in the state court's nolle prosequi order. (Doc. No. 56 at 21–22). Cobble is mistaken about *Heck*'s application.

"[T]he Supreme Court has foreclosed application of *Heck* in circumstances that do not involve an extant criminal conviction." *Printup v. Dir., Ohio Dep't of Job and Fam. Servs.*, 654 F. App'x 781, 791 (6th Cir. 2016) (citing *Wallace v. Kato*, 549 U.S. 384, 393 (2007)); *accord Thomas v. Plummer*, 489 F. App'x 116, 122 (6th Cir. 2012) ("Here, there is no state conviction to impugn. *Heck* is inapposite."). Because the purpose of the *Heck* doctrine "is to prevent a collateral attack by a 'convicted criminal defendant' on the conviction itself," it simply does not apply "where there is no conviction." *See Jones v. Clary Cnty., Ky.*, 959 F.3d 748, 764–65 (6th Cir. 2020) (quoting *Heck*, 512 U.S. at 484). In other words, if a Section 1983 action "will <u>not</u> demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608 (6th Cir. 2014) (citing *Heck*, 512 U.S. at 487).

The two cases on which Cobble relies for this argument—*Heck* itself, and *Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005)—are clearly distinguishable from this case because the plaintiffs in both cases had state criminal convictions. *Heck*, 512 U.S. at 478–47; *Cummings*, 418 F.3d at 680. Cobble does not cite any case extending the *Heck* rule to the circumstances here: a private citizen with no outstanding criminal judgment, ordered to forfeit property it was illegal

---

[6] The state court ordered that Plaintiff "shall forfeit the confiscated" firearm and magazines "since he is a convicted felon and is forbidden to have firearms." (Doc. No. 55-3 at 1–2).

11

for him to possess. And the Court is not aware of any such case. See Ongori v. City of Midland, No. 16-2793, 2017 WL 6759111, at *2 (6th Cir. Sept. 8, 2017) (citations omitted) ("We have found no authority that extends the Heck doctrine to a case where a private citizen sought to challenge the outcome of a proceeding which did not result in a criminal conviction or confinement."). Accordingly, the Heck doctrine does not bar Plaintiff's claims.

### C. Collateral Estoppel

Next, Plaintiff contends that the state court already decided the issue of the traffic stop's constitutionality in his favor. (Doc. No. 79 at 12; Doc. No. 83 at 8–9). "The Supreme Court has held that issues decided in a state-court criminal proceeding may preclude relitigation of the same issues in a subsequent § 1983 action in federal court." Wiggins v. Metro. Gov't of Nashville & Davidson Cnty., No. 16-5519, 2017 WL 4863166, at *2 (6th Cir. May 8, 2017) (quoting Donovan v. Thomas, 105 F.3d 291, 293 (6th Cir. 1997)). To that end, Plaintiff points to the following language in the state court's nolle prosequi order: "[T]he State moved that a nolle prosequi be entered . . . because the State concedes that the defendant's motion to suppress is well taken based on an illegal traffic stop of the defendant's vehicle." (Doc. No. 55-3 at 1). As explained below, however, this statement does not have preclusive effect in this action.

Tennessee law applies to Plaintiff's collateral-estoppel claim. Wiggins, 2017 WL 4863166, at *2. In Tennessee, a party asserting collateral estoppel must establish:

> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

12

Id. (quoting Bowen v. Arnold, 502 S.W.3d 102, 107 (Tenn. 2016)). The Troopers contend that Plaintiff has not satisfied the second, fourth, and fifth requirements. (Doc. No. 85 at 2).

The second requirement "that an issue be 'actually litigated' is generally satisfied if the issue was properly raised by the pleadings or otherwise placed in issue and was actually determined in the prior proceeding." Mullins v. State, 294 S.W.3d 529, 536 (Tenn. 2009) (citations omitted). Here, as the Troopers correctly note (Doc. No. 85 at 2), the state court did not make any determination on the merits of the traffic stop's legality in the nolle prosequi order. Instead, the state court simply noted the prosecutor's concession of the issue. Plaintiff thus does not satisfy the second requirement.

As to the fourth requirement, Defendants were not parties to the state criminal prosecution, so Plaintiff must establish that they are in privity with the State of Tennessee. In the collateral-estoppel context, "the concept of privity involves an examination of the parties' relationship to the subject matter of the litigation, not the relationships between the parties themselves." Goza v. SunTrust Bank, No. W2014-00635-COA-R3-CV, 2015 WL 4481267, at *6 (Tenn. Ct. App. July 22, 2015) (collecting cases). "[P]rivity is not established by parties being legally connected, . . . but rather whether they can claim the same legal rights asserted to the subject matter." Id. (quoting Suntrust Bank v. Stoner, No. 3:07-cv-397, 2009 WL 998403, at *2 (E.D. Tenn. Apr. 14, 2009)). Here, Plaintiff does not attempt to explain how the Defendants in this civil case, defending individual-capacity claims, have the same interest as the State of Tennessee had in the subject matter of Plaintiff's state criminal prosecution. Accordingly, Plaintiff has not carried his burden on the fourth requirement.

The fifth requirement "focuses on the affected parties." Mullins, 294 S.W.3d at 538 (citing Sartin v. Macik, 535 F.3d 284, 290 (4th Cir. 2008)). It is "[r]ooted in considerations of due

13

process," and generally requires the "'party against whom collateral estoppel is asserted'" to "'have had notice of the claim and an opportunity to be heard.'" See In re Couch, 704 F. App'x 569, 574 (6th Cir. 2017) (quoting Mullins, 294 S.W.3d at 538). Because Plaintiff has not demonstrated that the Defendants were a party or in privity with a party to Plaintiff's state criminal prosecution, Defendants did not have an opportunity to be heard on the legality of the traffic stop. Plaintiff therefore fails to satisfy this requirement as well.

Accordingly, the prosecutor's concession that the traffic stop was illegal in Plaintiff's state criminal case, as noted in the nolle prosequi order, does not have preclusive effect here.

### D.    Count I—Unreasonable Search and Seizure

Plaintiff asserts that the Troopers and Deputy Sheriff Cobble violated his Fourth Amendment rights to be free from unreasonable search and seizure. Defendants assert qualified immunity. (Doc. No. 56 at 12–17; Doc. No. 73 at 23–25). After "a defendant has raised a qualified immunity defense, the plaintiff bears the burden of showing that the defendant is not entitled to it." Jones v. Clark Cnty., Ky., 959 F.3d 748, 766 (6th Cir. 2020) (citations omitted). The Court analyzes "a defendant's assertion of qualified immunity in two steps: (1) determining whether the defendant violated a constitutional right and (2) deciding whether that right was clearly established at the time of the incident." Fazica v. Jordan, 926 F.3d 283, 289 (6th Cir. 2019) (citing Shreve v. Franklin Cnty., 743 F.3d 126, 134 (6th Cir. 2014)). The Court may address these steps in either order. Sumpter v. Wayne Cnty., 868 F.3d 473, 480 (6th Cir. 2017) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

Plaintiff's specific search-and-seizure claims are that the Troopers: (1) stopped his vehicle without probable cause or reasonable suspicion (Doc. No. 83 at 9–11); (2) extended the stop without reasonable suspicion (id. at 11–18); and (3) searched his vehicle without probable cause

14

(id. at 18). Plaintiff also asserts that Cobble: (1) is liable for the illegal search of his vehicle because he conducted an unreliable dog sniff (Doc. No. 79 at 8–10); and (2) searched his vehicle "and falsely identified [a] substance as marijuana to support the validity of Bolt's alert and 100% accuracy rate" (id. at 11–12).

If a traffic stop is invalid from the outset, the Court "analyze[s] the subsequent allegations of Fourth Amendment violations 'separately for each search or seizure that is alleged to be unconstitutional.'" Carter v. Hamaoui, 699 F. App'x 519, 532 (6th Cir. 2017) (quoting Cnty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1547 (2017)). The Court will thus address each asserted search-and-seizure claim separately and in turn.

### 1.    Initial Traffic Stop

Plaintiff asserts that the Troopers violated his Fourth Amendment rights when they stopped his vehicle. (Doc. No. 83 at 9). As explained below, material factual disputes preclude a grant of summary judgment on this claim.

The Troopers argue that they had probable cause and reasonable suspicion to stop Plaintiff for violating Tenn. Code Ann. § 55-8-123(1) (Doc. No. 73 at 8–9), which requires a vehicle to "be driven as nearly as practicable entirely within a single lane" and to not "be moved from that lane until the driver has first ascertained that the movement can be made with safety." Tenn. Code Ann. § 55-8-123(1). As the Troopers note, this is a misdemeanor offense. (Doc. No. 73 at 8 (citing Tenn. Code Ann. § 55-8-103)).

"The stop of a vehicle qualifies as the 'seizure' of a 'person' that must be 'reasonable' under the Fourth Amendment." United States v. Brooks, --- F.3d ----, 2021 WL 451010, at *3 (6th Cir. Feb. 9, 2021) (citing Whren v. United States, 517 U.S. 806, 809–10 (1996)). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred." United States v. Howard, 815 F. App'x 69, 73 (6th Cir. 2020) (quoting Whren, 517 U.S. at 810) (applying the probable cause standard to a stop premised on a violation of Tenn. Code Ann. § 55-8-123(1)). The Sixth Circuit has also recently suggested that reasonable suspicion of a completed misdemeanor—including the misdemeanor traffic offense at issue here[7]—may justify a traffic stop. See id. at 73 n.1.

"Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." United States v. Collazo, 818 F.3d 247, 254 (6th Cir. 2016) (quoting United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008)). "It 'does not require an actual finding of a violation, rather, a probability or substantial chance of criminal activity is all that is required.'" Id. (quoting United States v. Huff, 630 F. App'x 471, 495 (6th Cir. 2015)). Reasonable suspicion, meanwhile, requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396–97 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)). "Although a mere 'hunch' does not create reasonable suspicion," id. at 397 (citing Terry v. Ohio, 392 U.S. 1, 21–22 (1968)), "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." Id. (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

Here, under either the probable cause standard, or the less stringent reasonable suspicion standard, the Troopers' justification for the stop is the same. They claim that they observed Plaintiff's vehicle cross the white fog line three times: once while they were parked on the side of

---

[7] The Sixth Circuit has explained a vehicle failing to maintain lane under Tenn. Code. Ann. § 55-8-123, without more, is properly characterized as a completed violation, rather than ongoing criminal activity. See United States v. Simpson, 520 F.3d 531, 541 (6th Cir. 2008) (distinguishing United States v. Freeman, 209 F.3d 464 (6th Cir. 2000)).

16

the interstate, and twice more after they pulled onto the road behind Plaintiff.[8] (Doc. No. 84 at ¶¶ 6, 10–11). But Plaintiff claims that he did not cross the white fog line at any time before the Troopers activated their blue lights. (Doc. No. 83-7 at 12). And Cothron's dash cam video cannot resolve this factual dispute, as the Troopers concede that the video "did not capture Plaintiff's vehicle driving over the fog line." (Doc. No. 73 at 2 n.2).

Given this factual dispute, the Court cannot determine whether the initial traffic stop was justified at the summary judgment stage. A reasonable jury could credit Plaintiff's side of this dispute, which would leave the Troopers with no basis for probable cause or reasonable suspicion to initiate the stop. And if the jury accepts Plaintiff's claim, then the Troopers would not be entitled to qualified immunity because it was clearly established at the time that traffic stops are subject to the Fourth Amendment's reasonableness standard. See Whren, 517 U.S. at 810 ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."); Baynes v. Cleland, 799 F.3d 600, 610 (6th Cir. 2015) (quoting Humphrey v. Mabry, 482 F.3d 840, 846 (6th Cir. 2007)) ("The issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'"). Summary judgment will be denied on this claim.

### 2. Extending the Stop

Plaintiff next argues that the Troopers extended the traffic stop through the arrival of the drug dog without reasonable suspicion. (Doc. No. 83 at 11–18). The issue of reasonable suspicion only comes into play if the stop was actually extended. See United States v. Winters, 782 F.3d 289, 297 (6th Cir. 2015) (quoting United States v. Campbell, 511 F. App'x 424, 427 (6th Cir.

---

[8] The Troopers also mention that Plaintiff slowed down to about 10 miles per hour below the speed limit after they pulled behind him, but they do not actually explain how this act provided probable cause of a traffic violation or contributed to reasonable suspicion of a completed misdemeanor. (See Doc. No. 73 at 9). Plaintiff's act of slowing down thus does not factor into the Court's analysis of the initial traffic stop.

17

2013)) ("[B]ecause . . . use of [a] narcotics dog does not in itself raise Fourth Amendment concerns, [a party] can only prevail by 'show[ing] that the officer no longer had reason to keep him where he was' in order to conduct the dog sniff."). And for the reasons explained below, a reasonable jury could decide, first, that the Troopers extended the stop through the arrival of the drug dog, and second, that they did not have independent reasonable suspicion to do so.

### i. Scope and Duration

"Traffic stops are analyzed under the Terry v. Ohio framework because they are 'more akin to an investigative detention . . . than a custodial arrest.'" United States v. Lott, 954 F.3d 919, 923 (6th Cir. 2020) (quoting United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999)). "To qualify as reasonable seizures under the Fourth Amendment, Terry detentions must be limited in [both] scope and duration." Id. (internal quotation marks omitted) (quoting United States v. Everett, 601 F.3d 484, 488 (6th Cir. 2010)). "In scope, the investigative methods police officers employ 'should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time'; in duration, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" Id. (quoting United States v. Cochrane, 702 F.3d 334, 340 (6th Cir. 2012)).

Plaintiff challenges scope and duration separately. (Doc. No. 83 at 11–18). But the Court cannot view these issues in isolation from one another.[9] Rather, the Court "'must conduct a fact-bound, context-dependent inquiry in each case' to determine whether the 'totality of the circumstances surrounding the stop indicates that the duration of the stop as a whole—including

---

[9] That is because "mere questioning—on any subject—cannot violate the scope prong of Terry," such that "the subject of the questioning will . . . be irrelevant" where Terry's duration prong is not at issue." Everett, 601 F.3d at 494 n.10 (citing United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006)). But because Plaintiff challenges both the scope and duration of the stop, the Court may consider "the subject of the questions . . . as one factor in the diligence analysis." See id. (discussing Muehler v. Mena, 544 U.S. 93 (2005) and Arizona v. Johnson, 555 U.S. 323 (2009)).

any prolongation due to suspicionless unrelated questioning—was reasonable.'" <u>Cochrane</u>, 702 F.3d at 341 (internal quotation marks omitted) (quoting <u>Everett</u>, 601 F.3d at 493–94).

In conducting this inquiry, the "the overarching consideration is the officer's diligence—i.e., his persevering or devoted . . . application to accomplish [the] undertaking of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." <u>Id.</u> (quoting <u>Everett</u>, 601 F.3d at 494). It does not reflect a lack of diligence for an officer to "ask extraneous questions unrelated to the purposes" of an otherwise valid traffic stop, "'so long as those inquiries do not measurably extend the duration of the stop.'" <u>Id.</u> at 340 (quoting <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009)). But where "the totality of the circumstances" reflect that an officer "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation," that change in course must be supported by reasonable suspicion. <u>Id.</u> at 341 (quoting <u>Everett</u>, 601 F.3d at 495).

Here, Cothron's dash cam video reflects that the Troopers, when they started questioning Plaintiff, almost immediately abandoned the task of ascertaining whether Plaintiff committed a violation of Tenn. Code Ann. § 55-8-123(1). As Plaintiff points out (Doc. No. 83 at 10), the Tennessee Supreme Court has stated that "Section 123(1) does not create an offense that always may be discerned simply by observation." <u>State v. Smith</u>, 484 S.W.3d 393, 404 (Tenn. 2016) (citations omitted). "In many cases," the Court explained, "it will not be possible for an observing officer to discern either the reason for a driver's leaving [his] lane of travel or whether [he] first ascertained the safety of the maneuver." <u>Id.</u> at 410. And in such cases, "the officer would have to investigate further in order to determine whether the driving maneuver violated Section 123(1)." <u>Id.</u> (citing <u>People v. Hackett</u>, 971 N.E.2d 1058, 1066 (Ill. 2012)). Any such investigation "requires a fact-specific inquiry into the particular circumstances present during the incident to determine

whether factors such as weather, obstacles, or road conditions might have necessitated [a motorist's] lane deviation." Id. at 404 (quoting Hackett, 971 N.E.2d at 1066).

The Troopers did not conduct such an investigation. Indeed, over the course of the entire stop, the Troopers never asked Plaintiff about the particular circumstances of his alleged violations of Section 123(1). Over the roughly 3-minute-long initial questioning, the Troopers made several inquiries that do not reflect a lack of diligence as a matter of law.[10] But over that same period, they also asked questions aimed at discovering criminal activity unrelated to the purpose of the stop, like whether Plaintiff was part of the Gangster Disciples gang, if he had any drugs in the vehicle, and whether he would consent to a search of his vehicle. See Cochrane, 702 F.3d at 341 (noting that questions about drugs are not "justified by the interest in officer safety").

Viewing this evidence in Plaintiff's favor, the Troopers made no effort to investigate the alleged traffic-code violation they say justified the stop. The Court therefore concludes that the subject matter of the Troopers' questioning weighs against a finding of diligence. But the Troopers' extraneous questioning during this initial encounter was relatively brief, so this factor does not weigh heavily. See United States v. Stepp, 680 F.3d 651, 662 (6th Cir. 2012) (quoting Everett, 601 F.3d at 492) ("A traffic stop is not 'measurably' extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree.").

As to the duration of the stop, "'[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed;' whichever comes first."

---

[10] This includes generic inquiries within the scope of any typical traffic stop, like asking Plaintiff for his license and registration and whether he had any outstanding warrants. See Rodriquez, 575 U.S. at 355 (citing Delaware v. Prouse, 440 U.S. 648, 658–60 (1979)). This also includes an inquiry implicating the "'legitimate and weighty' interest" of officer safety, like whether Plaintiff had any weapons in the vehicle. See Everett, 601 F.3d at 494–95 (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977)). And it includes "context-framing questions" that "rarely suggest a lack of diligence," like whether Plaintiff had been working and why he was travelling his stated direction. See id. at 494 (quoting United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001), overruled on other grounds by Muehler v. Mena, 544 U.S. 93 (2005)).

Hernandez v. Boles, 949 F.3d 251, 256 (6th Cir. 2020) (quoting Rodriguez, 575 U.S. at 354), cert. denied, ---S. Ct.----, 2020 WL 6701087 (Nov. 16, 2020). Tasks tied to the traffic stop "include 'checking the driver's license [and] determining whether there are outstanding warrants against the driver.'" Id. (quoting Rodriguez, 575 U.S. at 355). "A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Rodriguez, 575 U.S. at 355 (quoting Indianapolis v. Edmond, 531 U.S. 32, 40–41 (2000)). Thus, "officers may not prolong a traffic stop to have a drug dog sniff a car . . . absent independent reasonable suspicion to detain the motorist(s)." Hernandez, 949 F.3d at 256 (citing Rodriguez, 575 U.S. at 355–57). This is a "bright-line rule," such that "any extension of a traffic stop absent independent reasonable suspicion is improper." Id. (citing Rodriguez, 575 U.S. at 355–57).

When the Troopers returned to the patrol car, Cothron called THP dispatch to request a warrant check and a drug dog. Cothron then checked Plaintiff's driver's license and called Wilson County to inquire about outstanding warrants, while Foster called BLOC to request an additional warrant check. By 8:14:22 p.m., all but one of the tasks tied to the traffic stop were completed— Wilson County had reported no outstanding warrants, the license check had showed a valid license, and dispatch had advised Cothron that the NCIC did not identify any outstanding warrants. Foster, however, had not heard back from BLOC, and it would be another more than 2.5 minutes until Deputy Sheriff Cobble arrived at the scene with the drug dog. Meanwhile, at no point before Cobble arrived did the Troopers actually start writing a traffic ticket.

The Troopers argue that the dog sniff did not prolong the stop because Foster's request for an additional warrant check from BLOC was still pending when Cobble arrived. (Doc. No. 73 at 12). Plaintiff, on the other hand, contends that the Troopers unreasonably prolonged the stop by waiting for the results of this additional warrant check. (Doc. No. 83 at 17–18).

21

In a civil case with similar facts, the Sixth Circuit recently addressed this very issue. In Hernandez, highway patrol-defendants argued that a dog sniff did not prolong a traffic stop because they were "still awaiting the results" of a BLOC warrant check, even though an initial NCIC warrant check had already come back negative. 949 F.3d at 255, 257 (footnote omitted). The Court explained that a jury could find "that it was unreasonable to continue to detain [motorists] after the initial warrant check . . . came back negative because that was not necessary to carry out the traffic stop—especially given that no ticket was being written." 949 F.3d at 258. The Court also noted, however, that the motorists had "point[ed] to no bright-line rule that officers are limited to checking one database for warrants during a traffic stop." Id. Thus, in the civil context, it is generally for the jury to decide the "circumstance-specific Fourth Amendment inquiry" of whether an additional warrant check was "'tied to the traffic infraction'" or whether "the traffic stop 'reasonably should have been' already completed." Id. at 257 (quoting Rodriguez, 575 U.S. at 354 and citing Gardenhire v. Schubert, 205 F.3d 303, 315–18 (6th Cir. 2000)).

Here, as in Hernandez, the Troopers were waiting on the results of an additional BLOC warrant check when the drug dog arrived and had not actually started writing a ticket. Thus, as in Hernandez, it is for a jury, not the Court, to determine "whether the Troopers impermissibly prolonged the traffic stop." Id. at 258.

### ii.    Reasonable Suspicion

Because a jury could conclude that the Troopers prolonged the stop, the Court must consider whether they had independent reasonable suspicion to do so. See id. at 256. To restate, reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette, 572 U.S. at 396–97 (quoting Cortez, 449 U.S. at 417–18). "For an officer's suspicion to be reasonable, he 'must point to specific and articulable

facts supporting his suspicion.'" Collazo, 818 F.3d at 257 (quoting United States v. Perez, 477 F. App'x 337, 341 (6th Cir. 2012)). Whether reasonable suspicion exists "is based on the 'totality of the circumstances,'" and a "'common sense'" view of the supporting evidence offered by the officer, "'as understood by those in the field of law enforcement.'" Id. (quoting United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004)).

The Troopers point to the following factors as supplying reasonable suspicion to extend the stop:

> [1] Plaintiff's driving behavior prior to the initiation of the traffic stop; [2] nervous behavior when questioned about weapons or drugs being in the vehicle; [3] Plaintiff's tattoo, which was known to Trooper Cothron to be associated with a gang; [4] Plaintiff's admission to prior gang involvement[;] and [5] Plaintiff's rigid posture and failure to make prolonged eye contact with Trooper Cothron.

(Doc. No. 79 at 14). The Court must not review these factors "in isolation, rather than as a factor in the totality of the circumstances." District of Columbia v. Wesby, 138 S. Ct. 577, 588 (2018) (quoting Maryland v. Pringle, 540 U.S. 366, 372 n.2 (2003)). In doing so, as explained below, a reasonable jury could conclude that the Troopers lacked a particularized and objective basis for suspecting legal wrongdoing before the drug dog's arrival.

First, the Troopers state that they observed Plaintiff's vehicle cross the fog line and travel about 10 miles per hour below the speed limit before initiating the stop. (Doc. No. 79 at 13). As discussed in detail above, there is a dispute of fact regarding the fog line. And as to Plaintiff's speed, Plaintiff does not dispute the Troopers' account, but he points out that "[i]t is not uncommon for people to hit their breaks when they see a police officer." (Doc. No. 83 at 13). Having reviewed the dash cam video, the Court agrees that Plaintiff's slowing down does not appear to be objectively suggestive of criminality in these circumstances.[11] See United States v. Samuels, 443

---

[11] As the Supreme Court has explained, it is "quite reasonable that a driver's slowing down . . . might well be unremarkable" on a busy highway "while quite unusual" on a remote, rural road. Cf. United States v.

F. App'x 156, 161 (6th Cir. 2011) (citations omitted) ("[F]actors such as a person's . . . slowing down upon sighting a police vehicle on a major interstate highway, while part of the reasonable suspicion analysis, are given little weight."). At this stage in the proceedings, therefore, the first factor lends very little weight to the Troopers' reasonable suspicion claim.

Next, the Court considers the second and fifth factors together. Second, it is undisputed that Plaintiff displayed nervous behavior when the Troopers asked him if he had drugs or weapons in the vehicle. And fifth, Plaintiff attempts to create a dispute of fact as to whether he had rigid posture and failed to make prolonged eye contact with Trooper Cothron by noting that this factual claim is taken from Cothron's affidavit, and the Troopers did not mention these indicators during their depositions. (Doc. No. 83 at 15). But a party can rely on an affidavit for a factual assertion, see Fed. R. Civ. P. 56(c)(1)(A), and Plaintiff does not supply any actual evidence to rebut this assertion, so the Court considers it undisputed as well.

Regardless, rigid posture and lack of eye contact are "indications of nervousness" that are "'relatively commonplace behaviors'" during a traffic stop. See Winters, 782 F.3d at 299 (footnote omitted) (quoting United States v. Johnson, 482 F. App'x 137, 145 (6th Cir. 2012)). Although the Court may consider nervousness "in finding reasonable suspicion in conjunction with other factors, it is an unreliable indicator, especially in the context of a traffic stop." Richardson, 385 F.3d at 630 (citations omitted). Indeed, the Sixth Circuit "has found nervousness inherently unsuspicious." United States v. Urrieta, 520 F.3d 569, 577 (6th Cir. 2008) (citations omitted). The Court therefore gives factors two and five "very limited or no weight in the reasonable-suspicion calculation." Id.

_____

Arvizu, 534 U.S. 266, 268, 270, 275–76 (2002) (finding that a driver's slowing down "from about 50–55 to 25–30 miles per hour" on an "unpaved road in a remote area of southeastern Arizona" supported a border patrol agent's reasonable suspicion of criminal activity). Plaintiff's driving here—slowing to about 60 in a 70 mph zone in the right lane of an interstate after passing a patrol car on the side of the road that subsequently pulled behind him—is consistent with the former.

24

Third, the Troopers contend that Cothron saw a tattoo on Plaintiff's right arm that Cothron knew to be related with the Gangster Disciples gang. (Doc. No. 73 at 13–14). Plaintiff attempts to undermine this factual assertion by arguing that "it is questionable" whether "Cothron could have clearly seen a tattoo" (Doc. No. 83 at 15–16), and by disputing that the tattoo was gang-related. (Id. at 16). But the dash cam video reflects that Cothron said, "I noticed your tattoo. Are you part of Gangster Disciples?" The video thus corroborates Cothron's claim that he saw a tattoo, and that he believed it to be at least potentially related to membership in a particular gang.

However, tattoos are "not criminal in themselves." Howard, 815 F. App'x at 77; see also United States v. Jackson, No. 1:09-cr-91, 2010 WL 1643243, at *4 (E.D. Tenn. Apr. 21, 2010) ("Defendant's tattoos also carry little weight because the presence of tattoos indicates very little as a practical matter."). Instead, as relevant here, tattoos might "support a finding of reasonable suspicion" to the extent they are "consistent with gang membership." Id. (citations omitted). The Court therefore considers the Troopers' third factor subsumed by the fourth—Plaintiff's admission of prior gang involvement.

When asked, Plaintiff told Cothron that he was not affiliated with the Gangster Disciples anymore, but that he was "a long time ago." Cothron did not question Plaintiff further about this affiliation. "Standing alone, a criminal record—let alone arrests or suspected gang affiliation—'is not sufficient to create reasonable suspicion of anything[.]'" United States v. Hammond, 890 F.3d 901, 906–07 (10th Cir. 2018) (quoting United States v. Rice, 483 F.3d 1079, 1085 (10th Cir. 2018)). That is because past criminal history "does not create a reasonable suspicion that criminal activity is currently afoot, which is what the Supreme Court requires." Joshua v. DeWitt, 341 F.3d 430, 446 (6th Cir. 2003) (citing Terry, 392 U.S. at 30). Similarly, "[t]he fact of prior gang affiliation . . . does not significantly address any 'individualized' suspicion, but targets a broad

class of people." United States v. Davis, No. 6:06CR00386, 2007 WL 490088, at *7 (N.D. Ohio Feb. 8, 2007) (citation omitted).

Of course, a criminal "record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior." United States v. Stepp, 680 F.3d 651, 667 (6th Cir. 2012) (quoting United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir. 2010)). Here, however, the Troopers do not explain how Plaintiff's admission of undefined involvement with a gang long ago contributed to a reasonable suspicion that Plaintiff, himself, was involved in criminal activity at the time the Troopers were questioning him. Accordingly, a reasonable jury could give little weight to the Troopers' third and fourth factors.

In sum, the five factors on which the Troopers rely to establish reasonable suspicion are entitled to little or no weight at this stage in the proceedings. The Sixth Circuit has succinctly explained the resolution of the reasonable-suspicion analysis in these circumstances:

> Although the reasonable-suspicion calculation examines the totality of the circumstances, even where the government points to several factors that this court has "recognized as valid considerations in forming reasonable suspicion," they may not together provide reasonable suspicion if "they are all relatively minor and . . . subject to significant qualification," particularly where the "case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases."

United States v. Bell, 555 F.3d 535, 540 (6th Cir. 2009) (quoting United States v. Townsend, 305 F.3d 537, 545 (6th Cir. 2002)). Thus, the Court cannot conclude that the Troopers had reasonable suspicion to extend the stop as a matter of law.

Finally, the Court concludes that the Troopers are not entitled to qualified immunity on this claim because Plaintiff's right to be free from this constitutional violation was clearly established at the time of the stop. See Illinois v. Caballes, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged

26

beyond the time reasonably required to complete that mission."); see also Townsend, 305 F.3d at 541 ("To detain [a] motorist any longer than is reasonably necessary to issue [a] traffic citation, . . . [an] officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct."). Accordingly, summary judgment on this claim is inappropriate.

### 3. Dog Sniff and Subsequent Search of Plaintiff's Vehicle

Next, Plaintiff asserts the Troopers did not have probable cause to search his vehicle (Doc. No. 83 at 18), and that Deputy Sheriff Cobble—handler for drug dog Bolt—is also liable for this illegal search (Doc. No. 79 at 7–11), because: (1) Bolt was not reliable; and (2) Bolt's alert was not valid. But Plaintiff has not provided sufficient evidence to undermine Bolt's alert, so summary judgment will be granted on this claim.

First, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Hamaoui, 699 F. App'x at 533 (quoting Florida v. Harris, 568 U.S. 237, 246–47 (2013)). There is ample evidence that Cobble and Bolt were certified for detecting narcotics at the time of the stop.[12] (See Doc. No. 55-1 (certification record); Doc. No. 55-4 (Cobble's declaration with attached certification record)). Indeed, Plaintiff admits as much for the purpose of summary judgment. (Doc. No. 84 ¶ 43).

This certification came from the North American Police Work Dog Association. (Doc. No. 55-1 at 19–20 (certificate); Doc. No. 63-3 at 9 (Cobble deposition excerpt); Doc. No. 79-7 at 4 (same)). Plaintiff fails to offer any evidence that this organization was not "bona fide." He seems to imply that Bolt's training was inadequate based on Cobble's testimony about where Bolt was

---

[12] That is so even without considering the report of Cobble's proffered expert, Ricky Wade. (See Doc. No. 55-1). Plaintiff requests that the Court hold a Daubert hearing before accepting Wade's testimony. (Doc. No. 79 at 1, 10). However, the Court need not resolve this request because Wade's report is unnecessary to the summary judgment analysis.

certified—the exterior and interior of a facility or building, rather than "out on the road." (Doc. No. 79 at 10 (citing Doc. No. 79-7 at 2)). But that gets the standard for a drug dog's presumption of reliability exactly backward. "[A] dog's alert only provides probable cause if, in 'controlled settings,' the 'dog performs reliably in detecting drugs.'" Hernandez, 949 F.3d at 259 (emphasis added) (quoting Harris, 568 U.S. at 248). That is because, as the Supreme Court explained, "[t]he better measure of a dog's reliability . . . comes away from the field, in controlled testing environments." 568 U.S. at 246 (footnote omitted). Plaintiff's argument that Bolt was trained "in a closed, controlled environment" (Doc. No. 79 at 10) simply highlights that Bolt was presumptively reliable.

As Plaintiff points out (id.), "circumstances surrounding a particular alert" by a generally reliable dog "may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." Harris, 568 U.S. at 247. Plaintiff offers five reasons to question Bolt's alert in these circumstances, but none is persuasive.

First, Plaintiff notes that Bolt's alert is passive,[13] so Cobble alone could interpret it. (Doc. No. 79 at 10). Cobble testified that Bolt's passive alert involves a breathing change and a head snap before culminating in a sit. (Doc. No. 79-7 at 4). Here, the dash cam video reflects that Bolt sat next to the driver side door of Plaintiff's vehicle. (Video 1 at 20:19:17). "Sitting is a common alert type for passive alert drug detection dogs." United States v. Fuchs, No. 18-cr-20400-MSN-dkv, 2019 WL 4751556, at *10 (W.D. Tenn. Sept. 30, 2019) (citing United States v. Johnson, 323

---

[13] "Generally, a drug detection dog is trained to alert in one of two ways: aggressive alert or passive alert. An aggressive alert dog will alert by performing behaviors such as biting or scratching at the odor source. A passive alert dog will alert by performing behaviors such as sitting, looking at the odor source, sniffing toward the source, or looking at the handler." United States v. Fuchs, No. 18-cr-20400-MSN-dkv, 2019 WL 4751556, at *10 (W.D. Tenn. Sept. 30, 2019) (citing United States v. Johnson, 323 F.3d 566, 567 (7th Cir. 2003)).

F.3d 566, 567 (7th Cir. 2003)). Plaintiff offers no evidence or legal authority that a certified drug dog with a passive alert, like Bolt, is any less reliable than one with an aggressive alert.

Second, Plaintiff argues that Cobble cued Bolt to alert because "[t]he video appears to show" that Bolt's sit was caused by Cobble jerking on Bolt's leash. (Doc. No. 79 at 10). But that is not a reasonable inference to draw from the video. Cobble testified that Bolt was on a leash six feet long. (Doc. No. 63-3 at 6). The video reflects that, as Cobble and Bolt walked down the driver side of Plaintiff's vehicle, Cobble held the leash closer to the middle than the end, such that Bolt had significantly shorter than six feet of slack. (Video 1 at 20:19:10). At one point, Bolt moves rapidly from the front of the vehicle toward the rear, and due to a combination of the leash's short slack and a slight pull from Cobble, Bolt returns to the front of the vehicle. (Id. at 20:19:22). Bolt sits a few seconds later (id. at 20:19:29), but it does not appear to be due to any "jerk" immediately preceding the sit.

Third, Plaintiff notes that Cobble praised Bolt after he sat, so Bolt must have "sat for reward, not because there were drugs in the vehicle." (Doc. No. 79 at 10). Cobble, however, testified that he does not reward Bolt with treats. (Doc. No. 63-3 at 7). And the video reflects that Cobble did not reward Bolt with a toy. (Video 1 at 20:19:29). Instead, after Bolt sat, Cobble said, "Good boy" a few times and gave Bolt a single pat. (Id.). This reward, such that it is, is not sufficient to overcome the presumption of reliability established by Bolt's certification. See United States v. Bentley, 795 F.3d 630, 636–37 (7th Cir. 2015) (expressing concern that a handler gave a drug dog a physical gift every time he alerted—something not present here—before ultimately finding the dog's alert reliable).

Fourth, Plaintiff notes that the Troopers did not find any illegal drugs in the vehicle. (Doc. No. 79 at 10). Of course, in Deputy Sheriff Cobble's post-search Canine Report, he claims to have

found "a very small amount of green plant material, consistent with marijuana, under the right front passenger seat." (Doc. No. 79-2 at 2). But even assuming that Plaintiff's vehicle did not contain any of the drugs Bolt was certified to detect, the Court does "not evaluate probable cause in hindsight, based on what a search does or does not turn up." Harris, 568 U.S. at 249 (citing United States v. Di Re, 332 U.S. 581, 595 (1948)). A trained drug dog's alert provides probable cause to search a vehicle even if officers do not subsequently find narcotics. See United States v. Coker, 648 F. App'x 541, 546 (6th Cir. 2016) (upholding the constitutionality of a vehicle search based on a drug dog's alert where the officers found a gun, not drugs).

Fifth and finally, Plaintiff contends that "[i]t is not impossible that an odor" from a nearby motel and convenience store caused Bolt to alert. (Doc. No. 79 at 10–11). Cothron testified that the traffic stop occurred on the off-ramp of an exit where a motel is located (Doc. No. 79-6 at 5), and there is a drawing from Cothron's deposition reflecting that there was a "gas station" just up the road on the same side as the traffic stop. (Doc. No. 79-4). But that drawing also states "not to scale" at the top. (Id.). The record therefore contains no evidence about how close the alleged motel and convenience store were to the traffic stop, or whether wind was blowing from these locations toward the stop at the time. Accordingly, Plaintiff's odor-based false alert theory is entirely speculative and contrary to the probable cause standard. See Harris, 568 U.S. at 246 n.2 ("In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found.").

As contemplated by Harris, Plaintiff has had the opportunity to challenge the reliability of Bolt, in general, and the validity of this alert, in particular. See 568 U.S. at 246–47. Plaintiff, however, has not come forward with sufficient evidence to overcome the presumption that Bolt's

alert provided probable cause to search Plaintiff's vehicle. Accordingly, considering this claim as a separate allegation of an unconstitutional search, Defendants are entitled to summary judgment. See Hamaoui, 699 F. App'x at 532 (citing Mendez, 137 S. Ct. at 1547) ("[I]f the searches [subsequent to an illegal traffic stop] are 'reasonable, taking into account all relevant circumstances,' the claims will fail.").

### 4. Cobble's Search of Plaintiff's Vehicle

In Plaintiff's final unreasonable-search-and-seizure claim, he asserts that Deputy Sheriff Cobble searched his vehicle "and falsely identified [a] substance as marijuana" on the post-search Canine Report "to support the validity of Bolt's alert and 100% accuracy rate."[14] (Doc. No. 79 at 11–12). That may or may not be so. But even if this allegation is true, Plaintiff does not explain how it actually violated his Fourth Amendment rights.

As explained above, Bolt's alert provided probable cause to search Plaintiff's vehicle. The state criminal proceedings following the traffic stop were based solely on the gun located by the Troopers, not the marijuana mentioned in the Canine Report. Plaintiff has not presented any evidence that he suffered an injury as a result of Cobble's allegedly false Canine Report. "[F]alse or inaccurate police reports," in isolation and not resulting in an identifiable injury, "do not pose a constitutional violation." Rich v. Palko, 920 F.3d 288, 298 n.18 (5th Cir. 2019) (citing Jarrett v. Twp. of Bensalem, 312 F. App'x 505, 507 (3d Cir. 2009)). Accordingly, Cobble is entitled to summary judgment on this claim. See Voyticky v. Vill. of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir. 2005) (citations omitted) ("Absent a further injury, such as loss of a government job or loss of a legal right or status, defamation, by itself, does not constitute a remediable constitutional claim.").

---

[14] In the Complaint, Plaintiff includes related allegations within his cause of action for Section 1983 conspiracy. (See Doc. No. 1 ¶¶ 101–02). But as explained above, Plaintiff has forfeited that cause of action.

31

### E. Counts II, V, VI—False Arrest and False Imprisonment

Plaintiff next asserts that Defendants violated his right to be free from false arrest and false imprisonment under federal and state law. (Doc. No. 79 at 7 ("It takes all of the defendants and Bolt to justify the stop and arrest of [Plaintiff]."); Doc. No. 83 at 18–19)). Under both federal and state law, "'the claims of false arrest and false imprisonment are the same' . . . when the alleged false imprisonment arises out of an alleged false arrest by a law-enforcement officer." Weser v. Goodson, 965 F.3d 507, 517 (6th Cir. 2020) (quoting Lee v. Ritter, No. 1:02-CV-282, 2005 WL 3369616, at *20 (E.D. Tenn. Dec. 12, 2005)). That is the case here, so Plaintiff's false imprisonment claims are subsumed within his false arrest claims. And as explained below, Defendants are entitled to summary judgment on these claims.

A federal false arrest claim arises under the Fourth Amendment. Id. at 513 (citing Howse v. Hodous, 953 F.3d 402, 409 (6th Cir. 2020)). It "requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." Id. (quoting Voyticky, 412 F.3d at 677). A Tennessee false arrest claim, meanwhile, requires a plaintiff to "prove '(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint.'" Id. at 517 (quoting Brown v. Christian Brothers Univ., 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013)).

Plaintiff's theory of relief on these claims is entirely dependent on the alleged Fourth Amendment violations that preceded his arrest. That is, Plaintiff simply repeats his argument that the Troopers illegally initiated the traffic stop, and that the Troopers unreasonably prolonged the stop until Deputy Sheriff Cobble arrived with the drug dog. (Doc. No. 83 at 18–19). And Cobble, Plaintiff argues, "certainly participated in the arrest" because Bolt's alert provided "probable cause to search and arrest" Plaintiff. (Doc. No. 79 at 12). But Plaintiff essentially concedes that, at the

32

time of the arrest, the Troopers had probable cause[15] to arrest him for possession of a firearm by a convicted felon under state law. (Doc. No. 83 at 19 ("While at the time of the arrest the officers may have had probable cause to believe [Plaintiff] was a felon in possession of a handgun, the seizure and detention of [Plaintiff] and events that led up to that probable cause were unlawful.")).

In short, because Plaintiff presents his federal and state false arrest claims as derivative of his preceding claims, they are not independently viable. See Mills v. Owsley Cnty. Ky., ---F. Supp. 3d----, 2020 WL 5237515, at *8 (E.D. Ky. Sept. 2, 2020) (discussing Mendez, 137 S. Ct. 1539) ("The search and the seizure here—each its own event—both are separate acts and generate separate Fourth Amendment claims."). Defendants will thus be granted summary judgment on Counts II, V, and VI.

## F.     Count III—Failure to Intervene

Finally, in the Complaint, Plaintiff makes the open-ended allegation that "one or more of the defendants stood by without intervening to prevent other defendants from violating Plaintiff's constitutional rights." (Doc. No. 1 ¶ 91). But in the summary judgment briefing, Plaintiff specifically articulates a theory of liability on his failure-to-intervene claim against only Trooper Foster. (See Doc. No. 83 at 20). Accordingly, to the extent that Plaintiff intended to bring this claim against all three Defendants, it is forfeited as to Trooper Cothron and Deputy Sheriff Cobble. See Dibrell, 984 F.3d at 1160 (concluding that plaintiff forfeited potential claims in an "opaque complaint" by not asserting them in response to a summary judgment motion).

---

[15] As the Troopers point out, probable cause was established both through their investigation of Plaintiff's criminal history at the scene after finding the gun (Doc. No. 73 at 15–17), and through the indictment subsequently returned by the Putnam County Grand Jury (id. at 17–18 & n.6). See Lester v. Roberts, 986 F.3d 599, 608 (6th Cir. 2021) (collecting cases) ("[T]he grand jury's finding creates a presumption of probable cause in later proceedings under § 1983."); Gordon v. Tractor Supply Co., No. M2015-01049-COA-R3-CV, 2016 WL 3349024, at *10 (Tenn. Ct. App. June 8, 2016) (citations omitted) ("At the summary judgment stage, evidence of a grand jury's indictment negates the element of lack of probable cause if the indictment is uncontested.").

33

"Law enforcement officials have a duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." Bunkley v. City of Detroit, Mich., 902 F.3d 552, 565 (6th Cir. 2018) (quoting Kaylor v. Rankin, 356 F. Supp. 2d 839, 850 (N.D. Ohio 2005)). An officer may be liable for failing to intervene in "preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." Id. at 565–66 (internal citations and quotations omitted).

Here, Plaintiff alleges no excessive force, and the Court has concluded that Plaintiff's independent claims for false arrest are not viable. As explained above, however, the Court has also concluded that summary judgment is inappropriate on two of Plaintiff's Fourth Amendment claims against the Troopers. Specifically, a reasonable jury could decide that the Troopers violated Plaintiff's constitutional right to be free from unreasonable seizure by (1) initiating the traffic stop, and (2) prolonging the stop through the arrival of the drug dog.

Plaintiff argues that Trooper Foster may be subject to liability for failing to intervene in these constitutional violations based on Foster's deposition testimony that Trooper Cothron was the person directing the traffic stop. (Doc. No. 83 at 20 (citing Doc. No. 83-9 at 2 (Foster deposition excerpt)). The Court agrees that summary judgment is not appropriate for this claim.

Foster was in the front passenger seat of Cothron's patrol car when the traffic stop was initiated. Foster was also present for and participated in the execution of the stop, from assisting with the initial questioning of Plaintiff, to observing Cothron request a drug dog from THP dispatch. Foster testified that it was Cothron's decision to request the dog. (Doc. No. 83-9 at 3). Foster also requested a warrant check from BLOC around that time. Thus, assuming that either the

34

initial stop or the stop's execution violated the constitution, Foster "observe[d] or ha[d] reason to know" that the violation was being committed. See Bunkley, 902 F.3d at 565 (internal citations and quotations omitted). Additionally, a reasonable jury could find that Foster "had 'a realistic opportunity to intervene to prevent the harm from occurring.'" See Kaylor, 356 F. App. 2d at 850 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). Finally, Foster is not entitled to qualified immunity on this claim because it was clearly established at the time of the stop that an officer has "a duty to intervene when another officer is unlawfully seizing an individual." Adeeko v. Chattanooga Metro. Airport Auth., No. 1:19-cv-113, 2020 WL 1442875, at *8 (E.D. Tenn. Mar. 24, 2020) (citing Smook v. Hall, 460 F.3d 768, 784 (6th Cir. 2006)).

The Court recognizes that, as a practical matter, this failure-to-intervene claim may seem redundant, given the Court's conclusion that a jury could find Foster liable for committing the underlying constitutional violations. But in a procedurally similar circumstance, the Sixth Circuit has explained that courts should not dismiss an otherwise viable failure-to-intervene claim based on its separate conclusion that an officer could be liable for the underlying violation. See Bunkley, 902 F.3d at 564 n.4.[16] Accordingly, Plaintiff's failure-to-intervene claim against Foster will not be dismissed at this stage in the proceedings.

## IV. Conclusion

For these reasons, Cobble's Motion for Summary Judgment (Doc. No. 55) will be granted, and the Troopers' Motion for Summary Judgment (Doc. No. 63) will be granted in part and denied in part. There are three claims remaining for trial: (1) the Fourth Amendment unreasonable-seizure

---

[16] In Bunkley, the Sixth Circuit allowed the plaintiff to "choose his preferred cause of action" for two reasons. 902 F.3d 564 n.4. One, "upon considering all of the evidence presented at trial, the jury could find that" the officer "did not actually participate in the" constitutional violation but was "nonetheless at fault for failing to intervene in" it. Id. And two, "the plaintiff is the master of the complaint and may proceed on [his] preferred cause of action." Id. (quoting Hamilton Cnty. Emergency Commc'ns Dist. v. BellSouth Telecomms. LLC, 852 F.3d 521, 532 (6th Cir. 2017)).

claim against the Troopers for initiating the traffic stop; (2) the Fourth Amendment unreasonable-seizure claim against the Troopers for prolonging the traffic stop through the arrival of the drug dog; and (3) the claim against Trooper Foster for failing to intervene in these two asserted constitutional violations.

An appropriate Order is filed herewith.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE